# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 12, 2010

No. 09-20472

Lyle W. Cayce
Clerk

BILLY RAY TRATREE,

Plaintiff - Appellant

v.

BP NORTH AMERICA PIPELINES, INC.,

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:03-cv-954

Before JOLLY and GARZA, Circuit Judges, and STARRETT, District Judge.[*]

PER CURIAM:[**]

Billy Ray Tratree appeals a jury verdict in BP's favor on Tratree's Title VII race discrimination and Age Discrimination in Employment Act (ADEA) claims. We conclude that Tratree's evidentiary challenges fail, and we affirm the jury's verdict.

---

[*] District Judge, United States District Court for the Southern District of Mississippi, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-20472

I

Billy Ray Tratree, who is African-American, worked for Amoco Pipeline Company (Amoco) starting in 1978, and continued working for BP when BP and Amoco merged in 1999. Beginning in 1995, he was a "Measurement Specialist I," and he worked on a section of BP pipeline between Mexia and Texas City, Texas. In 2001, BP decided to eliminate one of the two positions on that section of pipeline, and Kelly Gleason, the district manager, chose to eliminate Tratree's job instead of that of his coworker, Grayson Williams, who is a white male six years younger than Tratree and who was less senior than Tratree. Williams was classified as a "Field Specialist II," but performed approximately the same work as Tratree.[1] When he was terminated, Tratree was 49 years old and was three months away from turning 50, when he would have been eligible to retire.

Tratree's Union (the Oil, Chemical, and Atomic Workers International, now "PACE") has a collective bargaining agreement (CBA) with BP. The CBA includes a process called "bumping," whereby a Union member whose job position has been eliminated has the right to take the position of a less senior employee if the terminated employee is qualified for the position, thus bumping the less senior employee out of his job. The employee who exercises his bumping rights retains his pay level, benefits, and seniority rights in the new position. The CBA states that employees may bump other employees in either new or old classifications. However, BP presented evidence that according to its "bumping guidelines," as understood by both BP and the Union, an employee with a position in the new classification system, such as Williams, could not be bumped

---

[1] In 1996, Amoco started a "multi-skilling" program, later continued by BP, that created new job classifications. Employees were encouraged to become classified under the new system by performing training for the new positions, but they were not required to do so. Tratree was a Measurement Specialist I under the old system and was qualified to become a Field Specialist III, but chose not to change his classification. Williams completed his training and became a Field Specialist II (a level above Field Specialist III) in 2001.

No. 09-20472

by an employee classified under the old system, such as Tratree.

When his position was eliminated, Tratree was sent a bumping sheet, which listed the less senior employees whose positions Tratree had the option to take. The bumping sheet did not include the option of bumping Williams. According to the CBA, Tratree had five business days to sign the sheet before he would be terminated. He refused to sign it and instead complained that his bumping options were incorrect because they did not include the option to bump Williams. As a result of his failure to sign the sheet, Tratree was let go on September 27, 2001.

Tratree sued BP in November 2002, alleging race discrimination and retaliation under Title VII and §1981, and age discrimination and retaliation under the ADEA. The district court granted BP's motion for summary judgment on the Title VII and §1981 claims and on the ADEA failure-to-promote claim. After Tratree presented his case on the ADEA discrimination and retaliation claims, the district court granted BP's motion for judgment as a matter of law. Tratree appealed the district court's orders of summary judgment and judgment as a matter of law, and this court reversed the grant of summary judgment on his race discrimination claims and reversed the judgment as a matter of law on the age discrimination claims, affirming the remaining judgments. *Tratree v. BP North American Pipelines (Tratree I)*, 277 F. App'x 390, 2008 WL 1924171 (5th Cir. 2008). On remand, the jury returned a verdict for BP on both claims.

II

Tratree appeals the verdict based on several of the district court's evidentiary rulings. The district court's evidentiary rulings are reviewed for an abuse of discretion. *Price v. Rosiek Const. Co.*, 509 F.3d 704, 707 (5th Cir. 2007). Even if an abuse of discretion occurred, the ruling will be affirmed if the error was harmless; that is, if it did not affect the substantial rights of the complaining party. *Id.* "An error does not affect substantial rights if the court

3

is sure, after reviewing the entire record, that the error did not influence the jury or had but a slight effect on its verdict." *Id.* at 707–08 (quoting *Kelly v. Boeing Petroleum Svcs., Inc.*, 61 F.3d 350, 351 (5th Cir. 1995)).

A

Tratree challenges the district court's exclusion of evidence relating to his racial discrimination claim, which he argues would have demonstrated a "culture of discrimination" under Gleason. There were three types of excluded evidence: statistical evidence about the number of black employees and managers at BP, testimony from Tratree and other BP employees about differential treatment of African-Americans in Gleason's district, and testimony about racial epithets uttered by Tratree's coworkers in the 1980s.

Tratree argues that the law-of-the-case doctrine applies to prevent the district court from excluding any of this evidence because this court, in Tratree's prior appeal, indicated that "culture of discrimination" evidence was relevant to his claim. *See Tratree I*, 277 F. App'x at 394. "The law of the case doctrine, as formulated in this circuit, generally precludes reexamination of issues of law or fact decided on appeal." *Alpha/Omega Ins. Svcs. v. Prudential Ins. Co. of Am.*, 272 F.3d 276, 279 (5th Cir. 2001) (quotation marks omitted). However, the doctrine "applies only to those issues that were actually decided, rather than all questions in the case that might have been decided but were not." *Id.* Issues may be deemed to have been implicitly decided if they were "fully briefed to the appellate court and . . . necessary predicates to the [court's] ability to address the issue or issues specifically discussed." *Id.* (quoting *In re Felt*, 255 F.3d 220, 225 (5th Cir. 2001)). Tratree's law-of-the-case argument fails because the parties did not brief evidentiary issues in the prior appeal; the specific evidence at issue here was not before the court; and the court did not decide any issues of admissibility.

Tratree's challenge to the exclusion of the statistical evidence fails.

"[G]ross statistical disparities may be probative of discriminatory intent, motive, or purpose," but percentages that "fail to draw a comparison between the percentage of minorities in the workforce and the percentage of qualified minorities in the relevant candidate pool" are less convincing. *Scales v. Slater,* 181 F.3d 703, 709 n.5 (5th Cir. 1992). Tratree did not offer any comparison that would put the percentages he offered in context—they were simply raw percentages of black employees and managers at BP. Given the lack of comparative statistics that would put the percentages in perspective by reference to the number of African-Americans in the relevant applicant pool, the district court's exclusion was not an abuse of discretion. The percentages alone could not have been very probative of discrimination, if at all, and any probative value would have been outweighed by the danger of unfair prejudice. *See* FED. R. EVID. 403. Regardless, we are convinced that the raw percentages could not have had more than a slight impact on the jury's verdict, so any error would have been harmless.

Tratree's challenges to the district court's exclusion of testimony about differential treatment under Gleason also fail. Evidence about a discriminatory culture at BP or discriminatory acts of the decisionmakers who terminated Tratree would certainly have been relevant and probative. *See, e.g., Polanco v. City of Austin*, 78 F.3d 968, 979–80 (5th Cir. 1996); *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 577 (5th Cir. 2003). However, the district court did not exclude the testimony as generally irrelevant. Instead, after questioning one of the witnesses outside of the jury's hearing, and examining the deposition testimony of the other witness, the district court excluded the testimony because the witnesses either could not remember specific facts that would have made the past incidents relevant to Tratree's claim (such as the circumstances surrounding Gleason's firing of other African-Americans), or would have testified about experiences that were too far removed from Gleason himself (for instance,

one witness believed that a different supervisor acted through Gleason via "the art of Satan"). The court conducted a "careful, subjective consideration of the relevance of each proffered witness's testimony" and did not abuse its discretion in excluding the testimony. *See Kelly*, 61 F.3d at 359.

Further, the district court did not abuse its discretion in excluding testimony regarding racial epithets in the 1980s. Tratree's coworkers, supervisors, and managers had changed several times since the 1980s, so any minimal probative value of the 1980s evidence would have been outweighed by the danger of unfair prejudice. *See* FED. R. EVID. 403. Tratree argues that even if the evidence from the 1980s was too far removed in time to be probative of the culture of discrimination in 2001, it was probative of why Tratree did not sign the bump sheet, which he contends he refused to sign in part because he was "fed up" with being discriminated against at B.P. However, Tratree also testified that he did not sign the bump sheet because his union chair advised him not to, and that he would have signed it had his union chair advised him to do so. The union chair, to the contrary, testified that he did in fact advise Tratree to sign the bump sheet. The jury either believed the union chair's testimony, or else concluded that Tratree's reasons for signing the bump sheet were irrelevant to the question of discrimination, so the exclusion of the 1980s evidence was harmless.

Finally, Tratree contends that these evidentiary rulings combined caused the "crushing majority" of his circumstantial evidence of race discrimination to be excluded, citing *Brazos River Authority v. GE Ionics, Inc.*, 469 F.3d 416, 424 (5th Cir. 2006). In *Brazos*, the erroneous exclusion of evidence was reversible because it was "not merely cumulative"; no evidence on the issue had been placed before the jury. *Id.* Here, on the other hand, Tratree was able to present evidence regarding racial animus and discrimination, including that he was subject to racial slurs, that his supervisors did not protect him from the racial

slurs, and that his supervisors gave training priority to his white coworker. Even if any of the other racial discrimination evidence was excluded improperly, Tratree's "crushing majority" argument fails, and the combined exclusions were harmless.

## B

Next, Tratree argues that the district court improperly excluded evidence of age discrimination. He challenges the exclusion of several exhibits relating to Amoco's, and later, BP's, "multi-skilling" program, which he says would have shown that the program had the goal of discriminating against retirement-eligible workers. However, the exhibits were properly excluded because they were not relevant to age discrimination. They relate to overall severance targets (voluntary and involuntary) and do not mention targeting older or retirement-eligible employees for involuntary severance.

Tratree also challenges the exclusion of testimony from an employee that the multi-skilling program continued to operate under BP. The proffered testimony did not address whether the multi-skilling program was discriminatory, and would not have been relevant at all without the multi-skilling exhibits, which were properly excluded. The district court did not abuse its discretion in excluding the testimony.

## C

Tratree challenges the district court's exclusion of two items of evidence that he argues would have tended to show that BP's proffered reason for terminating Tratree was pretextual.

The court properly excluded testimony from Tratree's supervisor, Bowden, that sometime in 2000, Bowden would not allow Tratree time off to attend his mother's funeral because Bowden believed that Williams was not qualified to relieve Tratree. However, BP's proffered explanation for releasing Tratree focused on his and Williams's formal classifications in 2001, not on their relative

skill levels in 2000. Further, Tratree does not brief how the exclusion affected his substantial rights other than to assert that it did. We conclude that the exclusion was not an abuse of discretion, and was in any event harmless.

In addition, the court properly excluded evidence that BP paid large bonuses to Gleason and other district managers for their performance in 2001, which Tratree argues would have rebutted BP's claim that it eliminated Tratree's position because of a "downturn in business in the pipeline" in his region. The bonus evidence was minimally relevant to the overall economic situation of the pipeline; further, Tratree had already presented evidence on the performance of the pipeline and the fact that it continued to operate after he had been terminated, so the bonus evidence would have been cumulative. Any minimal probative value would have been outweighed by the likelihood of danger of unfair prejudice. *See* FED. R. EVID. 403. The district court did not abuse its discretion, and the exclusion in any event was harmless.

D

Finally, Tratree challenges the admission of evidence regarding the interpretation of the CBA. The CBA states that an employee whose job is eliminated may bump another employee of less seniority "within the new or old classification," but BP's justification for terminating Tratree instead of Williams was that, according to its usual bumping protocol, employees in old classification positions (like Tratree) could not bump employees in new classification positions (like Williams). Tratree argues that admission of the evidence (and presentation of the issue to the jury) violated the law of the case. In Tratree's prior appeal, this court noted that "BP's argument that it has a policy of favoring new over old classifications is not grounded in written company policy and is belied by the terms of the CBA," which "supports an inference that when BP eliminated Tratree's position and refused to allow Tratree to 'bump' Williams, it acted contrary to the terms and spirit of the CBA that BP shall not favor employees

in new classifications over those with old classifications." *Tratree I*, 277 F. App'x at 394. However, this reference to the CBA came as the court was examining all evidence "in the light most favorable to [Tratree], drawing all reasonable inferences in his favor, and disregarding all evidence adverse to him that a jury would not be required to believe." *Id*. at 393. Therefore, the court's description of the CBA cannot be considered a factual determination that became the law of the case. Further, the CBA's meaning as a matter of law was not before the court. The law of the case doctrine did not prevent BP from introducing evidence on remand that contradicted the *Tratree I* court's description of the CBA and supported BP's proffered explanation for firing Tratree.[2]

### III

For the foregoing reasons, the jury verdict and judgment in favor of BP is

AFFIRMED.

---

[2] Tratree also cursorily asserts that admission of the evidence regarding the CBA violated the parol evidence rule. The admission did not violate the parol evidence rule. The evidence regarded both parties' conduct *after* contracting and illustrated a modification to the CBA, agreed to by both the Union and BP.