**CONTINENTAL CASUALTY COMPANY, et al.,
Plaintiffs,**

v.

**FIRST FINANCIAL EMPLOYEE LEASING, INC., Defendant.**

**Case No. 8:08–CV–2372–T–27GW.**

United States District Court,
M.D. Florida,
Tampa Division.

June 3, 2010.

Keith Olin, Samuel J. Thomas, Sean C. Callahan, Bressler, Amery & Ross, P.C., Florham Park, NJ, for Plaintiffs.

Amy Lyn Koltnow, Joel Stephen Fass, Colodny, Fass, Talenfeld, Karlinsky & Abate, PA, Ft. Lauderdale, FL, for Defendant.

### *ORDER*

JAMES D. WHITTEMORE, District Judge.

**BEFORE THE COURT** are: (1) Defendant First Financial Employee Leasing, Inc.'s Motion for Partial Summary Judgment (Dkt. 64), to which Plaintiffs have responded (Dkt. 82); (2) Plaintiffs' Motion for Partial Summary Judgment (Dkt. 67) and separate Memorandum of Law (Dkt. 69),[1] to which Defendant has responded (Dkt. 80); (3) Defendant's Motion to Strike Plaintiffs' Response Memorandum (Dkt. 84), to which Plaintiffs have responded (Dkt. 91); (4) Plaintiffs' Cross–Motion to Strike Defendant's Opposition and Defen-

dant's Motion for Summary Judgment (Dkt. 91), to which Defendant has responded (Dkt. 94); and (5) Defendant's Motion to Strike Affidavit of Cynthia Goral and to Exclude Testimony at Trial (Dkt. 96), to which Plaintiffs have responded (Dkt. 107).

Plaintiffs brought this action to recover amounts owing under two policies of workers' compensation and employers liability insurance issued to Defendant. Defendant counterclaimed and asserted (a) a claim for breach of contract (Count I) alleging that one or more Plaintiffs breached their claims management and settlement obligations under one of the policies; (b) a second claim for breach of contract (Count II) alleging that Plaintiffs overcharged Defendant by failing to apply a premium credit in accordance with the policies and as mandated by Florida law; and (c) a claim for equitable accounting (Count III).

As to Count II, Defendant contends that (1) in determining the amount of premium owed by Defendant, Plaintiff was required by Florida law and the insurance policies to apply a premium credit provided by the Florida Contracting Classification Premium Adjustment Program ("FCCPAP"), as promulgated by the National Council on Compensation Insurance, Inc. ("NCCI") and (2) after being instructed to do so by NCCI, Plaintiff did initially apply the FCCPAP credit in its premium audit statements and thereby "endorsed" the policies to include the credit. In response, Plaintiffs argue that applying the FCCPAP to reduce Defendant's premium was neither required by the policies nor consistent with Plaintiffs' filed and approved rating plan. Additionally, Plaintiffs argue that, as Count II challenges a premium rate calculation and

---

1. Local Rule 3.01(a) provides that a motion must include "a concise statement of the precise relief requested, a statement of the basis for the request, and a memorandum of legal authority in support of the request, all of which the movant shall include in *a single document* of not more than twenty-five (25) pages." (emphasis added).

seeks a premium rate adjustment, Defendant was required to exhaust its administrative remedies under Section 627.371, Florida Statutes, before suing on Count II. As set forth below, the Court agrees that Defendant was required to exhaust its administrative remedies but failed to do so. Accordingly, Plaintiffs' Motion for Partial Summary Judgment is GRANTED and Defendant's Motion for Partial Summary Judgment is DENIED.

## Background

Plaintiffs American Casualty Co. of Reading, Pennsylvania ("American") and Continental Casualty Co. ("Continental") are insurance carriers. (Pretrial Statement, Dkt. 86 ¶ 9(c)). Plaintiff CNA ClaimPlus, Inc. is a claims administration company.[2] Although the nature of their affiliation is not entirely clear, Plaintiffs state that they all operate under the CNA Insurance Companies trademark and they refer to themselves collectively as CNA. Sather Aff. I, ¶ 2. Defendant First Financial Employee Leasing, Inc. ("FFEL") is an employee leasing company. (Dkt. 86 ¶ 9(c)).

Plaintiff American issued to FFEL a policy of workers' compensation and employers liability insurance for the effective dates of February 4, 2001 to February 4, 2002 (the "2001 Policy [Dkt. 64–1]") and a renewal policy for the effective dates of February 4, 2002 to February 4, 2003, (the "2002 Policy [Dkt. 64–2]"). (Dkt. 86 ¶ 9(d)-(e)). At FFEL's request, the 2002 Policy was terminated early, on December 31, 2002. *Id.* ¶ 9(e); Sather Aff. ¶ 3.

The Policies were issued as part of large deductible insurance programs (the "Programs") whose terms and conditions were outlined in the Policies and in (1) a Deductible Reimbursement Agreement between Plaintiff Continental and FFEL effective February 4, 2001; (2) a Claim Service Agreement between FFEL and RSKCo Claims Services, Inc., Plaintiff CNA ClaimPlus, Inc.'s predecessor in interest, effective February 4, 2001; and (3) confirmation letters sent by CNA to FFEL. *See* Sather Aff. I ¶ 5 and Exs. B, C, D & E (Dkt. 82–1 at 35–55 and Dkt. 82–2 at 1–44); *see also* Dkt. 86, ¶ 9(f)-(g).

Under Florida law, as to workers' compensation and employers liability insurance, every insurer must file with the Department of Financial Services (f/k/a the Department of Insurance) "every manual of classifications, rules, and rates, every rating plan, and every modification of any of the foregoing which it proposes to use." Fla. Stat. § 627.091(1). However, an insurer "may satisfy its obligation to make such filings by becoming a member of, or a subscriber to, a licensed rating organization which makes such filings and by authorizing the office to accept such filings in its behalf ..." *Id.* § 627.091(4). CNA states that NCCI has operated the only rating organization in the State of Florida for several decades. (Dkt. 82 at 21). NCCI has filed on behalf of its member carriers the Florida rates and rules contained in its Basic Manual for Workers Compensation and Employers Liability Insurance (the "NCCI Manual"). *See* Dkt. 110 at 4. Generally, an insurer may not issue a contract of insurance except in accordance with its filings, *see* Fla. Stat. § 627.191, and must "adhere to the filings made on its behalf" by NCCI, Fla. Stat. § 627.211; *see also* Dkt. 110 at 4.

The Programs were issued pursuant to a Workers' Compensation Loss Reimbursement Rating Plan approved by the Department of Insurance in January, 1996. *See* Sather Aff. I ¶ 8 and Ex. F (Dkt. 82–3 at 2–65); Dkt. 64–1 at 19–22; Dkt. 64–2 at

---

**2.** April 16, 2010, Affidavit of Matthew Sather ("Sather Aff. I" [Dkt. 82–1] ), ¶ 2.

20–24.[3] The Rating Plan provides for a premium calculated pursuant to actuarial formulas based, in part, on the amount of the deductible to be borne by the insured and the insured's expected losses (*i.e.*, the estimated frequency and magnitude of claims based on the insured's claims experience in prior years). Sather Aff. I ¶ 12.

The 2001 and 2002 Program's premiums are based on formulas that contemplate FFEL's deductible obligations (*i.e.*, risk retention) and loss experience. Sather Aff. I ¶ 13. The 2001 Policy and confirmation letters provide for a premium rate of $2.03 per $100 of payroll of covered employees. *See id.* ¶ 14; Dkt. 82–2 at 9, 13. Because the insured's actual payroll over the course of the policy term cannot be determined in advance, the payroll (and hence the premium based thereon) is subject to an audit following expiration of the policy's effective dates. Sather Aff. I ¶ 14.

The 2002 Policy and confirmation letters provide for a premium rate of 25.9% of "unmodified premium," which is defined as the "the State rates per class times the payroll for that class" but excludes charges for increased employers liability limits and the effects of an experience modifier. *See id.* ¶ 17; Dkt. 82–2 at 31, 35; Dkt. 64–2 at 21. Again, because unmodified premium is based on payroll and actual payroll over the course of the policy term cannot be determined in advance, the payroll (and hence the premium) is subject to an audit following expiration of the policy's effective dates. Sather Aff. I ¶ 18.

The Florida Contracting Classification Premium Adjustment Program was originally implemented in 1984 and was in ef-

fect throughout the effective dates of the Policies.[4] Generally, FCCPAP provides a premium credit for construction industry employers who pay higher than average hourly wages, apparently to account for the fact that, although the higher wages result in a higher premium (because premium calculations are based on payroll), they may not result in correspondingly greater liability exposure. *See* Sather Dep. at 91–92, 155–56; Sather Aff. I ¶ 21 ("In essence, FCCPAP is a rate equalization tool.").[5]

The Florida pages of the NCCI Manual (effective Jan. 1, 2001) provide that, to obtain the credit, the insured must within three years after the policy period ends submit required information about payroll to NCCI, which then calculates the credit. Dkt. 64–3 at 2. Additionally, the Manual provides:

> The carrier shall, upon audit, verify the information that was submitted by the insured and used in the calculation of the credit. If the carrier discovers an error in the [insured's] original request for policy credit, the revised information must be submitted to [NCCI] for recalculation. . . . The credit, authorized by [NCCI] shall appear on Item 4.[sic] of the policy. If the credit is not available at the time of policy issuance, the carrier shall endorse the policy to provide this credit information.

*Id.*

Additionally, the Manual requires the carrier to use an approved form to notify insureds with contracting classifications on

---

**3.** *See also* January 20, 2010 deposition of Matthew Sather ("Sather Dep." [Dkt. 66 at 4–50]) at 51.

**4.** *See* Dkt. 64–9 at 2; Rebuttal Expert Report of Dr. Phillip Borba ("Borba Rep." [Dkt. 72]) at 8.

**5.** *See also* March 12, 2010 deposition of Philip Borba ("Borba Dep." [Dkt. 81]) at 41–43; October 5, 2009 deposition of Howard Rosendale ("Rosendale Dep." [Dkt. 68]) at 82–83.

their policy that the insureds may be eligible for a premium adjustment credit. *Id.*

A November 7, 2003 NCCI Circular (the "NCCI Circular" [Dkt. 64–9 at 2–7] ) describes the administration of the FCCPAP program in greater detail. The NCCI Circular notes the extension of the program to 2004 and states that "[t]his program is mandatory and is applicable to all policies" with anniversary rating dates during 2004 that cover one or more of the eligible contracting classifications. (Dkt. 64–9 at 2). The NCCI Circular states that each carrier must issue a standard letter or notice (which is attached to the Circular) to every insured having a policy containing one or more of the eligible classifications. *Id.* The NCCI Circular further states that, upon the insured's submission of the required payroll data, NCCI will compute "the applicable premium classification credit, and the overall policy credit factor," which is expressed as a percentage to be applied to the employer's entire Florida standard premium to arrive at the credit amount, and will notify the carrier accordingly. *Id.; cf.* Borba Rep. at 16. The NCCI Circular further provides:

> The carrier will use this policy credit factor in the calculation of the insured's estimated premium at policy issuance. In those cases in which the carrier receives the policy credit factor after the insured's policy has been issued, *the policy will be so endorsed.*[6]
>
> At audit, the carrier *will use the same policy credit factor in the calculation of the insured's final earned premium* . . . .

*Id.* (emphasis added).

Finally, the NCCI Circular provides that the earned premium dollar adjustment amount resulting from application of the policy credit factor "must be reported on unit statistical reports under Classification Code 9046." *Id.* at 3.

The required notice was attached to the 2002 Policy. *See* Sather Aff. I ¶ 24; Dkt. 64–2 at 3–4. Entitled "Florida Contracting Classification Premium Adjustment Program Workers' Compensation Premium Credit Application 2001," the notice (1) informs FFEL that the FCCPAP applies to policies with effective dates on or after January 1, 2001; (2) states that "[a] special premium calculation, which may result in a premium credit for you, will be based on average hourly pay rates for each classification of contracting operations"; (3) instructs FFEL to send NCCI a completed premium credit application, which is attached, "[i]n order that your premium may be correctly established"; (4) advises FFEL that NCCI "will advise us of any premium credit applicable"; and (5) warns that if NCCI does not receive the insured's application within three years after the policy period ends, "your 2001 premium calculation will not reflect any possible premium credit." Dkt. 64–2 at 3–4. The 2002 Policy's endorsement schedule advises FFEL to read this "important" notice. (Dkt. 64–2 at 17).

As for the 2001 Policy, CNA admits that, pursuant to NCCI guidelines and based on the classification codes covered by the policy, CNA was obligated to provide FFEL with the same FCCPAP notice. *See* Sather Aff. I ¶ 23. Sather states that, because attachment of the notice to the policy documents was not an automated process in 2001, if the notice was provided with the 2001 policy (a point as to which Sather offers no information), "the underwriter or rater would have needed to manually attach the notice to the policy." *Id.*

---

**6.** The NCCI Circular states that "the required endorsement must be attached to the policy."

Dkt. 64–9 at 3.

Howard Rosendale, who negotiated the 2001 and 2002 Programs with FFEL's broker, did not recall the applicability of the FCCPAP credit ever being a part of the negotiations. Rosendale Dep. at 229.

Evidently, FFEL did apply for the FCCPAP credit. A July 15, 2003 letter from NCCI to CNA states that FFEL had applied and qualified for a 2001 FCCPAP premium credit, notifies CNA of the appropriate policy credit factor, and instructs CNA to "[p]lease endorse the insured's 2001/2002 policy." (Dkt. 64–5).[7]

FFEL submits a document (Dkt. 64–6) by which it contends CNA endorsed the policies. The endorsement has an effective date of February 4, 2001 and changes item 4 of policy no. WC194263450 (the number for both Policies) to add the "Florida Contracting Premium Adjustment," code 9046, in an amount to be determined at audit. However, the endorsement states that it shall not be binding upon the carrier unless countersigned by an authorized representative of the company and no signature appears on the document. Terri Hill, who discovered the document in the audit file, did not know whether it was sent to the insured.[8] Surprisingly, CNA does not even mention the endorsement in its response.

Sather states that CNA complied with NCCI's instructions and endorsed the policies "through the audit process" to reflect the FCCPAP credit. Sather Aff. If 28. Specifically, Sather avers that a July 28, 2003 audit adjustment for the 2001 Policy and an August 12, 2003 audit adjustment for the 2002 Policy "applied the designated

credit percentages for the respective years pursuant to NCCI's instructions." *Id.* ¶ 29.

CNA's July 28, 2003 premium audit statement for the 2001 Policy voids a prior audit billed on August 21, 2002 and states that the reason for the correction is to "apply FL contracting credit of 7.00%." (Dkt. 82–4 at 38). A line item for code 9046 records a $32,884 FCCPAP credit that (after application of a loss reimbursement plan factor, which is the factor that accounts for FFEL's deductible reimbursement obligation, *i.e.*, its retained risk, *see* Borba Rep. at 9) results in a total earned premium of $846,254. (Dkt. 82–4 at 51; *see also* Borba Rep. at 14).

Similarly, CNA's August 12, 2003 premium audit statement for the 2002 Policy voids a prior audit billed on June 25, 2003 and states that the reason for the correction is to "revise to add FL contracting credit .92" (Dkt. 82–4 at 53).[9] A line item for code 9046 records a $683,033 FCCPAP credit that (after application of a loss reimbursement plan factor) results in a total earned premium of $1,903, 174. (Dkt. 82–4 at 60; *see also* Borba Rep. at 16).

Sather opines that this application of the 7% policy credit factor in the July 28, 2003 and August 12, 2003 audit adjustments "serves as the endorsement to the policies to which NCCI refers" in its July 15, 2003 letter. Sather Aff. I ¶ 29; *see also* Sather Dep. at 108; Hill Dep. at 19. Sather avers that CNA endorsed the policies in this manner "to comply with NCCI's instructions pertaining to statistical reporting re-

---

7. Sather states that he does not recall seeing any correspondence from NCCI instructing CNA to endorse the 2002 Policy. Sather Aff. I 27.

8. *See* February 10, 2010 deposition of Terri Hill ("Hill Dep." [Dkt. 66 at 52–91] at 78).

9. Although the figure .92 was merely another way of expressing an 8% credit, it does not reflect the actual percentage applied in the audit, which was 7%. Said differently, the .92 figure on the cover sheet was a mistake that did not affect the results of the audit. *See* Borba Dep. at 160–6; Hill Dep. at 149–52.

quirements," Sather Aff. I ¶ 29, and to comply with "NCCI guidelines as well as Florida law for statistical reporting of data related to the qualifying class codes under the FCCPAP program," *Id.* ¶ 30. Apparently, the July 28, 2003 and August 12, 2003 audit adjustments were sent to NCCI. *See* Sather Dep. at 140.

Sather concedes that NCCI uses the reported information "to verify that the insured had the FCCPAP credit modified onto the policy...." Sather Aff. ¶ I 39. However, Sather believes that NCCI is not interested in whether the required modification (*i.e.*, application of the policy credit factor) actually reduces the premium charged to the insured. *See* Sather Aff. I ¶ 40 ("NCCI does not concern itself with whether the FCCPAP alters the [insured's] premium or not. NCCI simply tracks what insureds are entitled to the credit for statistical reporting purposes."); Sather Dep. at 101.

Sather asserts that, although CNA applied the policy credit factor in the July 28, 2003 and August 12, 2003 audit statements, "CNA is reporting to NCCI that they applied the credit *and* the credit is inapplicable to the subject policy." Sather Aff. I ¶ 41 (emphasis added). Sather does not identify which part of the July 28, 2003 or August 12, 2003 audit statements indicate that the FCCPAP credit is inapplicable, and a review of those statements, by themselves, provides no indication that the FCCPAP credit is inapplicable. Rather, those statements apply the FCCPAP credit to arrive at a reduced total earned premium.

Sather believes that "[i]ncluding the FCCPAP credit at the time of the audit *does not mean* that the credit [actually] applies to the ... policies." *Id.* ¶ 30. At his deposition, Sather appeared to acknowledge the incongruity of "applying" in the audit process a premium credit that did not in fact apply to the Policies (*i.e.*, to which the insured is not entitled). Asked why CNA did not simply respond to NCCI's letter by informing NCCI that the credit did not apply (and therefore CNA would not endorse the Policy as directed), Sather admitted that CNA could have so responded "when this credit was first put on—or actually when the large deductible policy was first put into place." Sather Dep. at 169. Sather at first stated that he did not know why CNA had not done so. *Id.* However, Sather added that, as he understood it, CNA had handled the situation as it did to avoid criticism or other adverse action by NCCI for noncompliance with its directive to endorse the policy. *Id.* at 169–70.

At all events, the "application" of the contracting credit in the July 28, 2003 and August 12, 2003 audit statements did not ultimately result in a reduction of the premium charged to the insured. This is because, after "application" of the credit in the first step of a two-step (and two-day) audit adjustment process, CNA changed the loss reimbursement plan factor (or deductible factor, as some witnesses called it) in the second step (and second day) of the process to offset the FCCPAP credit amount.[10]

Thus, for the 2001 policy, although in the July 28, 2003 audit statement (or, as Borba calls it, audit report) "CNA included a 7% Florida CCPAP credit in the premium calculation" to arrive at a total earned

---

10. Although CNA appears to reject this characterization (Dkt. 82 at 13), Sather and Hill agreed that the purpose and effect of the second step was to offset the FCCPAP credit amount included in the step-one (or previous day's) audit report. *See* Sather Dep. at 132–34, 140; Hill Dep. at 89–90, 124; *see also* Borba Rep. at 13–15, 18–21; Borba Dep. at 144; *cf.* Pretrial Statement, Dkt. 86 at 3.

premium of $846,254, in the audit on the following day, July 29, 2003, CNA "included the 7% Florida CCPAP credit in the premium calculation [but] decreased the loss reimbursement credit factor" to arrive back at a total earned premium of $909,935 (*i.e.,* the total earned premium reported in an audit performed before CNA received the NCCI letter). *See* Borba Rep. at 13–14, 18.[11]

Similarly, for the 2002 policy, although in the August 12, 2003 audit statement CNA applied the FCCPAP credit to arrive at a total earned premium of $1,903,174, in the audit on the following day, August 13, 2003 (which lists as the reason for the audit to "revise ded[uctible] credit"), "CNA included the 8% [sic] Florida CCPAP credit [but] decreased the loss reimbursement credit factor" to arrive back at a total earned premium of $2,068,665 (*i.e.,* an amount within $14 of the total earned premium reported in an audit performed before CNA received the NCCI letter). *Id.* at 15–16.[12]

CNA's witnesses agreed that the purpose of the alteration of the deductible factor was to ensure that, regardless of the contracting credit, the premium ultimately charged to the insured was the one that the parties contractually agreed to at the outset and that was stated in the Policies and the confirmation letters. *See* Hill Dep. at 27–28, 42–45, 53–54, 84, 89, 152; Sather Aff. I ¶ 31.[13] Additionally, Sather

believes that reducing the charged premium based on the FCCPAP credit (*i.e.,* "applying" the credit in the ordinary sense of the word to the standard premium calculated in accordance with the Rating Plan) would have been inconsistent with CNA's Rating Plan (which does not mention the credit) and therefore offsetting the credit was required to maintain compliance with the Rating Plan.[14] CNA's expert, Dr. Philip Borba, agreed that "including consideration of the [FCCPAP] in the calculation of the premium ... would result in premiums not in conformance with [CNA's] filed and approved program." Borba Rep. at 7–8.

Sather believes that the FCCPAP credit is not mandatory where a carrier has its own rating plan approved by the Department of Insurance and the rating plan does not mention the credit. Sather Aff. I f 35. Bruce Smith, FFEL's chief executive officer and Rule 30(b)(6) designee, appeared to agree.[15]

### *Standard*

Summary judgment is proper if, following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P.

11. The final premium audit for the 2001 program (Dkt. 64–7; Dkt. 82–4 at 2–15), dated March 28, 2007, similarly records an FCCPAP credit of $32,786 that (after application of the loss reimbursement plan factor) results in a total earned premium of $909,940.

12. The final premium audit for the 2002 program (Dkt. 64–8; Dkt. 82–4 at 16–24), dated August 11, 2004, records an FCCPAP credit of $683,033 that (after application of the loss reimbursement plan factor) results in a total earned premium of $2,068,665, *i.e.,* the same

amount as reported in the August 13, 2003 audit.

13. *See also* September 17, 2009 deposition of Bill Romashko ("Romashko Dep. I" [Dkt. 65 at 3–59] ) at 175 184–85, 189–93.

14. Sather Dep. at 93, 134, 166,169–70; Sather Aff. I ¶ 37.

15. *See* August 27, 2009 deposition of Bruce Thomas Smith ("Smith Dep." [Dkt. 71 at 15–23] ) at 47.

56(c)(2). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir.2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir.2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548.

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *Morrison v. Am-*

*way Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the nonmoving party. *Id.*

### Discussion

#### Exhaustion

CNA contends that FFEL's claims and defenses based on its alleged entitlement to the FCCPAP credit should be dismissed for failure to exhaust its administrative remedies under Section 627.371, Florida Statutes.[16] The Court agrees.

Section 627.371 provides an administrative procedure and remedy for an insured who is "aggrieved by any rate charged, rating plan, rating system, or underwriting rule" followed or adopted by an insurer or rating organization. Subsection (1) provides for a two-step review process. The first step is a written request to the insurer:

(1) Any person aggrieved by any rate charged, rating plan, rating system, or underwriting rule followed or adopted by an insurer, and any person aggrieved by any rating plan, rating system, or underwriting rule followed or adopted

---

**16.** FFEL argues that CNA waived its right to assert the exhaustion defense by failing to plead it. *See* Fed.R.Civ.P. 8(c)(1) (providing that a responsive pleading must include any affirmative defense); *Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir.1988) ("[T]he general rule is that, when a party fails to raise an affirmative defense in the pleadings, that party waives its right to raise the issue at trial."). However, the Eleventh Circuit has cautioned courts to avoid "hypertechnicality" in applying Rule 8(c) and to focus instead on enforcing its purpose, which is to provide notice of a defense and an opportunity to rebut it. *Id.* "When there is no prejudice, the trial court does not err by hearing evidence on the issue." *Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797 (11th Cir. 1989) (plaintiff was not prejudiced by defendant's failure to assert statute of limitations

defense in the answer as defendant raised the issue in a motion for summary judgment one month prior to trial); *Jones v. Miles*, 656 F.2d 103, 107 n. 7 (5th Cir.1981) ("Neglect to affirmatively plead the defense is simply noncompliance with a technicality and does not constitute a waiver where there is no claim of surprise."). Waiver of defenses on summary judgment is disfavored. *See Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 612 (4th Cir.1999), *abrogation on other grounds recognized by Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277 (4th Cir.2004). As FFEL alleges no unfair surprise and no prejudice other than the cost of discovery (Dkt. 80 at 8), the Court construes Plaintiffs' Motion for Partial Summary Judgment as including a request to amend Plaintiffs' answer pursuant to Fed.R.Civ.P. 15 to include the exhaustion defense and the Court grants the request.

by a rating organization, may ... make written request of the insurer or rating organization to review the manner in which the rate, plan, system, or rule has been applied with respect to insurance afforded her or him.

Fla. Stat. § 627.371(1). If the insurer or rating organization does not grant the request for review within thirty days, the insured may treat the request as having been denied. *Id.* The next step is an appeal to the Office of Insurance Regulation ("OIR"):

> Any person aggrieved by the refusal of an insurer or rating organization to grant the review requested, or by the failure or refusal to grant all or part of the relief requested, may file a written complaint with the office, specifying the grounds relied upon. If the office has already disposed of the issue as raised by a similar complaint or believes that probable cause for the complaint does not exist or that the complaint is not made in good faith, it shall so notify the complainant. Otherwise, and if it also finds that the complaint charges a violation of [chapter 627] and that the complainant would be aggrieved if the violation is proven, it shall proceed as provided in subsection (2).

*Id.* If the complaint states a violation of Chapter 627's provisions governing rates and ratemaking, OIR may order corrective action (including a premium adjustment) pursuant to subsections 2 and 3. *See* Fla. Stat. § 627.371(2) & (3).

In *Florida Welding & Erection Serv., Inc. v. American Mut. Ins. Co. of Boston,* 285 So.2d 386, 389 (Fla.1973), the Florida Supreme Court concluded that application of rate data (such as an experience modification factor) to arrive at a workers' compensation insurance premium "appears to

have an adequate basis for administrative review under [Section] 627.371." Given the availability of administrative review and the general rule that "[w]here an administrative remedy is provided by statute, relief must be sought by exhausting this remedy before the courts will act," *id.* at 390, the Court held that the insured's failure to exhaust the remedy provided by Section 627.371 precluded a challenge to the billed rates in the circuit court, *id.* *Florida Welding* and cases applying it have established a "general rule requiring an insured to challenge the good faith calculation of ... workers' compensation insurance premiums in an administrative forum." *FCCI Ins. Co. v. NCM of Collier County, Inc.,* 15 So.3d 5, 7 (Fla. 2d DCA 2009).

Here, the parties dispute the scope of this rule. *Florida Welding* required exhaustion of a challenge to a workers' compensation insurance premium based on an allegedly inaccurate experience modifier. *American Home Assurance Co. v. Phineas Corp.,* 347 F.Supp.2d 1231 (M.D.Fla.2004), required exhaustion of a workers' compensation policy premium calculation challenge based on (a) erroneous premium data (resulting from an allegedly unauthorized reallocation of payroll among employee classification codes), and (b) a contention that the premium should in the circumstances have been based on estimated rather than actual payroll. *See* 347 F.Supp.2d at 1234, 1237. Outside the workers' compensation insurance context, in *Serchay v. State Farm Florida Ins. Co.,* 25 So.3d 652 (Fla. 4th DCA 2010), the Fourth District Court of Appeal required exhaustion of a premium calculation challenge based on an insurer's alleged failure to provide a statutorily mandated premium discount for having a windstorm-mitigating hip roof.[17]

---

17.  *See also State Farm Mut. Auto. v. Gibbons,*

860 So.2d 1050 (Fla. 5th DCA 2003) (requir-

In *Serchay*, the court acknowledged the distinction between rates and premium discounts but concluded that "a premium discount is inextricably linked to the rate charged and, therefore, section 627.371 applies to the plaintiff's action." 25 So.3d at 654. The court reasoned that

Amount of insurance × Rate = Premium. Because the amount of insurance specified in a policy is a constant, a premium discount necessarily requires lowering the rate charged. Thus, to the extent an insured claims to have been wrongly deprived of a premium discount, the insured essentially is claiming to have been aggrieved by the rate charged.

*Id.* Accordingly, the court concluded generally that "a request for a 'premium adjustment' necessarily must arise from a challenge to the 'rate charged' " within the meaning of Section 627.371. *Id.*

Significantly, the court in *Serchay* also disagreed with the reasoning of the federal district court in *Elite II v. American Cas. Co. of Reading, Pa.*, No. 8:05–CV–1623–T–17MAP, 2006 WL 1319540 (M.D.Fla.2006), which involved a party to this case, testimony by Defendant's expert, Monty Gale, and similar facts. In *Elite II*, the insured filed an action for declaratory judgment on its right to premium credits under the FCCPAP. In response to a motion to dismiss for failure to exhaust, the insured argued that the case was not about the calculation of rates but about the insurer's knowing refusal to refund a premium overpayment. 2006 WL 1319540 at *1. The district court acknowledged that "this case is about the total premium due for the policies issued to Plaintiff." *Id.* at *2.

However, the district court concluded that exhaustion was not required because

Plaintiff is not challenging alleged improper classification, or the rates on which the premium is based. Plaintiff is seeking a declaration that the policy provisions require Defendant to apply the FCCPAP credit in calculating the correct premium for the policy periods. The Court recognizes the regulatory scheme and the discretion of the Florida Department of Insurance, but finds that the resolution of this case will turn on construction of the insurance policies.

*Id.*

In *Serchay*, the insured relied on *Elite II* to argue that a premium challenge based on a failure to apply a premium discount did not require exhaustion. 25 So.3d at 655. However, the Fourth District Court of Appeal respectfully disagreed with *Elite II* based on its own analysis of the statute and case law and noted that "the federal district court's decision did not examine any of the Florida state cases which we have examined, and appears inconsistent with those cases." *Id.*

FFEL argues that (a) its claims, like those in *Elite II*, are based not on rates or rate calculations but on CNA's breach of its obligation under the policies to apply the FCCPAP and (b) because its claims and defenses are based solely on construction of the insurance policies, "the result will turn on construction of the insurance policies" (Dkt. 80 at 4), as in *Elite II* Furthermore, FFEL characterizes *Serchay*'s disagreement with *Elite II* as dicta.

ing exhaustion of a claim alleging a violation of Fla. Stat. § 627.0651(12), which prohibits insurance companies from including in their rate base for motor vehicle insurance policies monies paid on bad faith and punitive damages claims and related attorney's fees and costs). *Progressive Express Ins. Co. v. Reaume*, 937 So.2d 1120 (Fla. 2d DCA 2006) (requiring exhaustion of a challenge to a premium discount approved by OIR as a financing charge in excess of the maximum allowed by Fla. Stat. § 627.901).

**1188**

■ The Court concludes that FFEL was required to exhaust its administrative remedies under Section 627.371 before filing suit. First, FFEL's contention that this case is not about premium rates is incorrect. The evident purpose of the FCCPAP credit is to effectively reduce construction classification rates that disfavor certain employers paying above-average wages.[18] As Sather put it, the FCCPAP is essentially "a rate equalization tool." Sather Aff. ¶ 21.

Second, *Serchay* expressly held that Section 627.371 applies to a premium discount. To that extent, its disagreement with *Elite II* was necessary to the decision and not dicta. To the extent that FFEL contends that the FCCPAP credit is mandated by statute, *Serchay*'s holding applies because there is no relevant difference between a statutorily mandated premium discount and a statutorily mandated premium credit.

Third, even to the extent *Serchay*'s holding does not cover the facts of this case (*e.g.*, because FFEL's claim is based in part on contract), its extraordinarily broad rationale does. *Serchay* reasoned that because a premium adjustment necessarily changes the rate charged, a claim to a premium discount is essentially a challenge to the "rate charged" within the meaning of Section 627.371.[19]

Fourth, *FCCI Ins. Co. v. NCM of Collier County, Inc.* appears to support requiring exhaustion here. *FCCI* involved a premium calculation challenge based on (a) allegedly inaccurate payroll amounts and

loss reserves and (b) an allegation that the insurer had "*agreed* to reduce the premium amount" after being informed that losses were overstated. 15 So.3d at 6 (emphasis added). Although it distinguished *Elite II*, the Second District Court of Appeal in *FCCI* required exhaustion of a claim for a premium reduction based in part on an alleged agreement between the parties. *FCCI* thus suggests that a premium challenge is not necessarily exempted from the requirement of administrative review merely because it is based in part on contract.

Finally, FFEL's contention that its claim for a premium refund is based solely on a construction of the Policies and the "endorsements" is disingenuous. FFEL has contended throughout this lawsuit and continues to contend that application of the FCCPAP credit is mandated not only by the Policies but also by Florida law, *i.e.*, Florida statutory law and the NCCI Manual as "codified" by Florida law or regulation.[20]

In sum, Florida appellate courts have not followed the narrower interpretation of *Florida Welding* suggested by *Elite II* and relied on by Defendant. Absent a persuasive indication that the Florida Supreme Court would disagree with *Serchay* or decide the issue differently, the Court concludes that FFEL was required to exhaust its administrative remedies under Section 627.371 before seeking relief in court. *See McMahan v. Toto*, 311 F.3d 1077, 1080 (11th Cir.2002) ("[A]bsent a decision from the state supreme court on an issue of

---

18. The NCCI Circular indicates the close connection between FCCPAP and rates by noting that, because the FCCPAP provides credits but no debits, "rate changes are necessary [in the Manual, presumably] for all the applicable classifications in order to offset the premium credits." (Dkt. 64–9 at 2).

19. The Court notes that plaintiff in *Serchay* has sought discretionary review in the Florida Supreme Court. *See* Plaintiff's Amended Brief in Support of Discretionary Review, SC10–474, 2010 WL 1705769 (April, 2010).

20. *See, e.g.*, Dkt. 11 ¶¶ 22, 25; Dkt. 64 at 2, 3, 7, 9.

state law, we are bound to follow decisions of the state's intermediate appellate courts unless there is some persuasive indication that the highest court of the state would decide the issue differently.").

### Motion to Strike

■ Rule 30(b)(6) governs deposition notices directed to organizations. The deposition notice "must describe with reasonable particularity the matters for examination." Fed.R.Civ.P. 30(b)(6). In response, the organization must designate one or more persons to testify on its behalf as to those matters. *Id.* "The persons designated must testify about information known or reasonably available to the organization." *Id.* As the persons designated represent the corporation just as an individual represents himself at a deposition, *see United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C.1996), the organization's "duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved. The [organization] must prepare the designee to the extent matters are reasonably available, whether from documents, past employees, or other sources." *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir.2006) (citation and internal quotation marks omitted).[21] The organization must prepare the designees "so that they may give complete, knowledgeable and binding answers on behalf of the corporation." *Marker v. Union Fid.*

*Life Ins. Co.*, 125 F.R.D. 121, 126 (M.D.N.C.1989).

■ A corporate party does not satisfy its obligations under Rule 30(b)(6) by merely "producing a designee and [then] seeing what he has to say or what he can cover." *Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 504 (D.Md.2000). "If it becomes obvious that the deposition representative designated by the corporation is deficient, the corporation is obligated to provide a substitute." *Brazos River Auth.*, 469 F.3d at 433 (citing *Marker*, 125 F.R.D. at 126).

■ If the designated deponent cannot answer questions regarding the subject matter as to which he is designated, then "the corporation has failed to comply with its Rule 30(b)(6) obligations and may be subject to sanctions." *King v. Pratt & Whitney, a Div. of United Techs. Corp.*, 161 F.R.D. 475, 476 (S.D.Fla.1995). Fed.R.Civ.P. 37(d)(1)(A)(i) authorizes sanctions if a Rule 30(b)(6) designee fails to appear for a deposition, and producing an unprepared Rule 30(b)(6) witness may be sanctionable as a nonappearance under the Rule. *See Resolution Trust Corp. v. Southern Union Co., Inc.*, 985 F.2d 196, 197 (5th Cir.1993) (If the organization's Rule 30(b)(6) designee "is not knowledgeable about relevant facts, and the [organization] has failed to designate an available, knowledgeable, and readily identifiable witness, then the appearance is, for all practical purposes, no appearance at all.").[22] Per-

---

21. *See also Taylor*, 166 F.R.D. at 362 ("Rule 30(b)(6) explicitly requires [the organization] to have persons testify on its behalf as to all matters known or reasonably available to it and, therefore, implicitly requires such persons to review all matters known or reasonably available to it in preparation for the Rule 30(b)(6) deposition. This interpretation is necessary in order to make the deposition a meaningful one and to prevent the 'sandbagging' of an opponent by conducting a half-

hearted inquiry before the deposition but a thorough and vigorous one before the trial."); *Calzaturficio S.C.A.R.P.A. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 37 (D.Mass.2001) ("Even if the documents are voluminous and the review of those documents would be burdensome, the deponents are still required to review them in order to prepare themselves to be deposed.").

22. *See also Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 303–304 (3d

missible sanctions include an order "prohibiting the [organization] ... from introducing designated matters in evidence," Fed.R.Civ.P. 37(b)(2)(A)(ii), in addition to or in lieu of an award of reasonable expenses, including attorney's fees, caused by the nonappearance. Fed.R.Civ.P. 37(d)(3).

Additionally, some courts have stated generally that when the Rule 30(b)(6) representative claims ignorance of a subject during the deposition, the organization is precluded from later introducing evidence on that subject unless the evidence was previously unavailable. *See Function Media, LLC. v. Google, Inc.,* No.2:07–CV–279–CE, 2010 WL 276093, *1 (E.D.Tex. Jan. 15, 2010) ("When the 30(b)(6) representative claims ignorance of a subject during the deposition, courts have precluded the corporation from later introducing evidence on that subject."); *Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.,* 2007 WL 4410370, at *8 (N.D.Tex. Dec. 14, 2007) ("Federal courts have interpreted [Rule 30(b)(6) ] as prohibiting a 30(b)(6) representative from disclaiming the corporation's knowledge of a subject at the deposition and later introducing evidence on that subject."); *Ierardi v. Lorillard, Inc.,* Civ. A. No. 90–7049, 1991 WL

158911, at *3 (E.D.Pa. Aug. 13, 1991) ("Under Rule 30(b)(6), [the organization] has an obligation to prepare its designee to be able to give binding answers on behalf of [the organization]. If the designee testifies that [the organization] does not know the answer to ... questions, [the organization] will not be allowed to effectively change its answer by introducing evidence during trial."); *Rainey v. American Forest and Paper Ass'n, Inc.,* 26 F.Supp.2d 82, 94 (D.D.C.1998) ("Unless it can prove that the information was not known or was inaccessible, a corporation cannot later proffer new or different allegations that could have been made at the time of the 30(b)(6) deposition.").

These decisions overstate the binding effect of Rule 30(b)(6) testimony. Although Rule 30(b)(6) testimony is that of the corporation, it does not constitute a judicial admission and the corporation "is no more bound than any witness is by his or her prior deposition testimony. A witness is free to testify differently from the way he or she testified in a deposition, albeit at the risk of having his or her credibility impeached by the introduction of the deposition." *R & B Appliance Parts, Inc. v. Amana Co., L.P.,* 258 F.3d 783, 786–87 (8th Cir.2001).[23] Although

Cir.2000) (adopting the *Resolution Trust* rule); *Continental Cas. Co. v. Compass Bank,* No. CA04–0766–KD–C, 2006 WL 533510, *17 (S.D.Ala. Mar. 3, 2006) ("It is the consensus of most federal courts to have considered the issue that a failure to appear at deposition sanctionable under Rule 37(d)(1) includes those circumstances in which a 30(b)(6) corporate designee appears at deposition unprepared to testify."); *but cf. Zappia Middle East Const. Co., Ltd. v. Emirate of Abu Dhabi,* No. 94 CIV–1942(DC), 1995 WL 686715, *8 (S.D.N.Y. Nov. 17, 1995) ("In order for the court to impose sanctions [in this situation], the inadequacies in a deponent's testimony must be egregious and not merely lacking in desired specificity in discrete areas.").

**23.** *See also A.I. Credit Corp. v. Legion Ins. Co.,* 265 F.3d 630, 637 (7th Cir.2001); 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice & Procedure § 2103; 7 James W. Moore et al, Moore's Federal Practice § 30.25[3]. An attempt to retract without explanation an admission made in Rule 30(b)(6) deposition testimony may however implicate the "sham affidavit" doctrine. *See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.,* 736 F.2d 656, 657 (11th Cir.1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

preclusion may be imposed as a sanction, it does not follow automatically from the nature of Rule 30(b)(6) testimony.

FFEL served CNA with an Amended Notice of Taking Rule 30(b)(6) Deposition (Dkt. 107 at 11–18) in January, 2010. CNA states that it designated four persons to provide testimony regarding the subjects specified in the notice. (Dkt. 107 at 2). The subjects as to which CNA designated William Romashko included "[p]ayments made by Defendant to Plaintiffs in connection with the policies of insurance and related agreements at issue in this Action, including, but not limited to, payments for losses, claim handling fees, expenses and taxes associated with claims submitted for coverage under the policies and related agreements"; "[c]redits applied by Plaintiffs in connection with the policies of insurance and related agreements at issue in this action"; and "[t]he amounts Plaintiffs claim are owed by Defendant pursuant to the [2001 and 2002] program documents." Dkt. 107 at 8–9 (Nos. 4, 5, 11–12, & 14); *see also* Romashko Dep. II at 4.

Romashko was deposed on January 22, 2010.[24] A review of the transcript shows that Romashko was unable to adequately respond to certain questions concerning the amounts due and paid by FFEL. For instance, Romashko testified that

(1) although he was generally familiar with the amounts CNA claimed were owing, had confirmed their accuracy by reviewing CNA accounting records, and assumed (erroneously, as it turned out) that CNA had produced a spreadsheet summarizing the amounts, he could not recall how much was owed on each Policy, Romashko Dep. II at 15–19;

(2) although CNA had "collateral inventory" records showing the collateral posted by FFEL and any adjustments to the FFEL collateral account, Romashko did not know the amount initially posted, had not reviewed the pertinent collateral file, did not know exactly how much collateral was drawn down and applied to FFEL's outstanding debts, had no information to give about a specific $2,806,000 withdrawal in 2004 (although he vaguely recalled discussions between the parties about drawing on the collateral to pay a debt no longer outstanding and not at issue in this lawsuit), and did not know what documentation still existed as to that transaction because he had not looked at the file and he confined his attention to amounts CNA claimed were currently owing, *id.* at 40–46;

(3) in connection with a balance of about $11,000 that allegedly remained in FFEL's collateral trust account and had not been applied to its debts (notwithstanding an understanding between the parties that CNA would draw down the account for that purpose), Romashko had no knowledge as to whether the $11,000 had ever been so applied or, if not, why not, although Romashko could (and, implicitly, would upon request) research the application of the $11,000 and the drawdown of the collateral account and provide testimony on both points, *id.* at 58–59;

(4) as to three lump sum payments of $150,000 each made to CNA in 2007, although he stated that they were credited and remained available as offsets to the amounts FFEL owed but were not yet allocated to particular invoices or transactions because (as he believed 61–91] ).

24. *See* January 22, 2010 deposition of Bill Romashko ("Romashko Dep. II" [Dkt. 65 at

based on his review) CNA had no information as to what invoices or items they were meant to be applied, Romashko did not know whether CNA ever inquired from FFEL how they should be applied, *id.* at 47–53;

(5) although he explained that claims-handling fees could change from year to year owing to changes in aggregate claim amounts (upon which they were based), and he explained several entries on that basis, Romashko was not able to state without further examination of the billing documents what caused a credit of $944 in an October 10, 2006 invoice (although he speculated that it might be the result of a subrogation payment that reduced the aggregate claim amount), *id.* at 67–68.

Additionally, FFEL complains that Romashko admitted to grave deficiencies in CNA's accounting system. Romashko testified that, although the somewhat archaic accounting system could produce a report showing all transactions and adjustments (essentially, an accounts receivable summary), some interpretation of the report (which would be "in code ... not in layman's language") would be required to understand the reason for particular entries. *Id.* at 29–32. Additionally, Romashko testified that, because each invoice or audit statement reflects current amounts owed using a "change method for accounting," *id.* at 28, no single billing document would provide a history of all debits, payments, and credits together with the final result (the amount currently outstanding), although the billing statements or invoices contained the data from which such a summary could be created, *id.* at 28–29, 32–35.

In a January 27, 2010 letter (Dkt. 107 at 23), FFEL's counsel stated that at depositions during the previous week, CNA's witnesses referred to documents requested but not previously produced and requested an "Accounting History/Consolidated Report showing all amounts billed, paid and credited and related key/explanation."

In response to the request, Cynthia Goral, an account manager in CNA's Legal Collections Department, prepared a spreadsheet summarizing FFEL's account history, which was produced to FFEL on March 10, 2010, *i.e.*, after the March 1, 2010 discovery deadline.[25] The spreadsheet details FFEL's premium and loss obligations under both Programs, amounts paid by FFEL, the application of paid amounts, the dates FFEL made payments, the application of FFEL's collateral to outstanding debts, credits to FFEL, and the source and amount of monies still owed. Goral Aff. ¶¶ 5–8.

FFEL moves to strike the Goral affidavit on the ground that it contains unspecified "material information that Plaintiffs refused to provide during [the Romashko deposition]," Dkt. 96 at 8, and that should have been provided through Romashko, *id.* at 10. FFEL did not request an extension of the discovery deadline so that FFEL may depose Goral or anyone else as to the information provided in the Goral affidavit.

In response, CNA contends that (a) the Goral affidavit does not contradict Romashko's testimony but merely explains the information in the spreadsheet, which was provided in response to a specific discovery request that Romashko's testimony evidently enabled FFEL to make, (b) given the general nature of the subjects specified in the notice, CNA did not anticipate that FFEL would want to explore in the Rule 30(b)(6) deposition the capabilities of CNA's accounting system, and (c) to the extent FFEL has any legitimate concern, it should have moved to compel more com-

---

**25.** *See* April 16, 2010 Affidavit Cynthia Goral ("Goral Aff. [Dkt. 82–5]") ¶ 4.

plete testimony or sought to depose Goral or someone else able to explain the spreadsheet. (Dkt. 107 at 6–7).[26]

Contrary to FFEL's contention (Dkt. 96 at 8), Romashko did not "refuse" to provide any information at his deposition. Moreover, Romashko did not claim corporate ignorance as to the subjects in question, and the information in the Goral affidavit does not contradict (although it supplements) Romashko's testimony. *See Goodyear Tire & Rubber Co. v. Great Sw. Express Co., Inc.,* No. Civ.A. 2:04–CV–69–WC, 2006 WL 587600, *2 (N.D.Ga. March 10, 2006) (denying motion to strike supplemental affidavit in part because the affidavit did not contradict or alter substantive testimony given at the Rule 30(b)(6) deposition); *Houlihan Lokey Howard & Zukin Capital, Inc. v. Protective Group, Inc.,* 506 F.Supp.2d 1230, 1245 (S.D.Fla.2007). Furthermore, Romashko testified knowledgeably about many of the matters noticed, and to some extent even about the amounts paid and owed by FFEL. However, Romashko was not sufficiently prepared to testify as to those amounts. Although a Rule 30(b)(6) deposition is not a memory contest and he was apparently not requested to bring any documents to the deposition,[27] Romashko should have been fully prepared to speak for the corporation as to these amounts. Accordingly, the Court finds that CNA should be sanctioned for Romashko's failure to "appear" within the meaning of Rule 37(d)(1) as to these areas of inquiry. However, in light of the general nature of the topics noticed

and the testimony Romashko did provide, the Court concludes that the drastic remedy of striking the additional information provided in the Goral affidavit is unwarranted. Rather, the appropriate sanction is to require CNA to pay all costs and attorney's fees associated with the actual taking (as opposed to preparation time) of Romashko's Rule 30(b)(6) deposition on January 22, 2010.

### Equitable Accounting

Under Florida law, a party seeking an equitable accounting must demonstrate that (1) the parties share a fiduciary relationship or the questioned transactions are complex, and (2) the remedy at law is inadequate. *American United Life Ins. Co. v. Martinez,* 480 F.3d 1043, 1071 (11th Cir.2007); *Kee v. Nat'l Res. Ins. Co.,* 918 F.2d 1538, 1540 (11th Cir.1990). "When a judgment for breach of contract is obtainable, the remedy at law is considered adequate, precluding the need for the imposition of an equitable remedy." *Kee,* 918 F.2d at 1541 (citing *Mary Dee's, Inc. v. Tartamella,* 492 So.2d 815, 816 (Fla. 4th DCA 1986)).

FFEL asserted in Count III a claim for equitable accounting to determine (1) the amount of the premium refund to which FFEL is entitled based on the FCCPAP (an amount that FFEL now believes it has ascertained[28]) and (2) amounts owed to CNA for allocated loss adjustment expenses, claims handling fees, and reimbursement for reserves established after the 2001 and 2002 Policies

---

26. *But see Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.,* 228 F.3d at 302 ("[U]nlike subdivision (b) of Rule 37, on its face subdivision (d) does not require the court, prior to imposing sanctions, to have issued an order compelling discovery.").

27. *See* Romashko Dep. II at 14. *But cf.* Dkt. 107 at 12.

28. *See* Dkt. 64 at 10 n. 6 ("If CNA had applied the FCCPAP credit without any offsets, First Financial would be entitled to a premium refund of $151,095 for the 2001 policy term and $165,492 for the 2002 policy term.") (citing the November 16, 2009 expert report of Monty Gale [Dkt. 64–11] ).

converted to incurred loss programs. Dkt. 11, ¶ 30. FFEL moves for summary judgment as to Count III and argues that the undisputed facts show a fiduciary relationship between the parties, the complexity of the transactions between them, and the inadequacy of a legal remedy.

As noted above, a judgment for breach of contract is generally an adequate legal remedy. FFEL presents no substantial evidence showing the inadequacy of contract damages. *See Sussman v. Weintraub*, No. 06–20408–CIV, 2007 WL 908280, 5 (S.D.Fla. March 22, 2007) (granting summary judgment where counterclaimant's "failure to demonstrate that a remedy at law is inadequate preclude[d] their claim for accounting."); *Kee*, 918 F.2d at 1540 (affirming summary judgment as to claim for equitable accounting where, although raising an issue of fact as to the complexity the transaction, plaintiff made no showing that the remedy at law was inadequate). Indeed, FFEL's jury demand (as to the Supplemental Complaint) and request for relief from its initial jury trial waiver indicates FFEL's own view that a jury determination of its own and CNA's damages is both available and preferable.

Furthermore, FFEL's attempt to show the inadequacy of its legal remedy ignores record evidence. FEEL asserts its inability to determine (a) how CNA calculated its loss expenses and taxes and interest charges, (b) how FFEL's payments and collateral were applied, (c) whether amounts owed by CNA to FFEL were appropriately credited, and (d) whether the amounts claimed due exceed a "plan maximum," *i.e.*, a cap on the total amount CNA could collect under the Policies for loss reimbursement expenses. (Dkt. 64 at 10–11).

As to the plan maximum, FFEL relies on Romashko's inability to state the amount without further research. However, CNA submits a "Summary of Maximum Losses Chargeable" (Dkt. 90 at 41–42) that provides the information and that, as counsel avers (although without stating when), *see* Callahan Aff., Dkt. 90, ¶ 14, was produced to FFEL. As to interest charges, counsel avers that CNA shared the interest calculations with FFEL at the March 17, 2010 mediation. *See* Callahan Aff. ¶ 15 & Ex. H (Dkt. 90 at 44). Otherwise, FFEL relies on the deficiencies in Romashko's testimony and especially his acknowledgment that no single billing document would provide the comprehensive account summary desired by FFEL. However, the spreadsheet prepared by Goral appears to provide that summary. FFEL's recent receipt of the document (and the information as to interest charges and plan maximum) might well have justified an extension of the discovery deadline had the remedy been timely requested. However, FFEL did not request such an extension.

In sum, although the Court understands that FFEL encountered difficulties in ascertaining the accounting information it wanted (in part because of sanctionable conduct on the part of CNA, as noted above), FFEL appears to possess the information now and, to the extent it does not, an equitable accounting is not a substitute for discovery available and permitted under the Federal Rules of Civil Procedure. *See Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*, 694 F.Supp.2d 1275, 1280–81 (S.D.Fla.2010).

### *Conclusion*

For the foregoing reasons, Defendant's Motion to Strike Affidavit of Cynthia Goral and to Exclude Testimony at Trial (Dkt. 96) is **GRANTED** in part to the extent that, pursuant to Rule loss reimbursement expenses. (Dkt. 64 at 10–11).

As to the plan maximum, FFEL relies on Romashko's inability to state the amount without further research. However, CNA submits a "Summary of Maximum Losses Chargeable" (Dkt. 90 at 41–42) that provides the information and that, as counsel avers (although without stating when), *see* Callahan Aff., Dkt. 90, ¶ 14, was produced to FFEL. As to interest charges, counsel avers that CNA shared the interest calculations with FFEL at the March 17, 2010 mediation. *See* Callahan Aff. ¶ 15 & Ex. H (Dkt. 90 at 44). Otherwise, FFEL relies on the deficiencies in Romashko's testimony and especially his acknowledgment that no single billing document would provide the comprehensive account summary desired by FFEL. However, the spreadsheet prepared by Goral appears to provide that summary. FFEL's recent receipt of the document (and the information as to interest charges and plan maximum) might well have justified an extension of the discovery deadline had the remedy been timely requested. However, FFEL did not request such an extension.

In sum, although the Court understands that FFEL encountered difficulties in ascertaining the accounting information it wanted (in part because of sanctionable conduct on the part of CNA, as noted above), FFEL appears to possess the information now and, to the extent it does not, an equitable accounting is not a substitute for discovery available and permitted under the Federal Rules of Civil Procedure. *See Managed Care Solutions, Inc. v. Essent Healthcare, Inc.,* 694 F.Supp.2d 1275, 1280–81 (S.D.Fla.2010).

### Conclusion

For the foregoing reasons, Defendant's Motion to Strike Affidavit of Cynthia Goral and to Exclude Testimony at Trial (Dkt. 96) is **GRANTED** in part to the extent that, pursuant to Rule 37(d)(3), Defendant is awarded costs and attorney's fees incurred in the taking of William Romashko's Rule 30(b)(6) deposition on January 22, 2010. Defendant shall file proof of costs and fees within fourteen days after entry of a final judgment.

Plaintiffs' Motion for Partial Summary Judgment (Dkt. 67) is **GRANTED**.

Counts II and III of Defendant's Counterclaim are **DISMISSED**, and Defendant's Affirmative Defenses to the Complaint and Supplemental Complaint, to the extent that they are based on the FCCPAP allegations, are **DISMISSED**.

Defendant's Motion for Partial Summary Judgment (Dkt. 64) is **DENIED**.

Defendant's Motion to Strike Plaintiffs' Response Memorandum (Dkt. 84), Plaintiffs' Cross–Motion to Strike Defendant's Opposition and Defendant's Motion for Summary Judgment (Dkt. 91), and Plaintiffs' requests for oral argument (Dkt. 69 at 2; Dkt. 82 at 2) are **DENIED.**